UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------X

BENIHANA OF TOKYO, LLC,

                           Plaintiff,

              -v-

ANGELO, GORDON & CO., L.P. and BENIHANA
INC.,

                        Defendants.

------------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 3-8-17

16 Civ. 3800 (PAE)

<u>OPINION & ORDER</u>

PAUL A. ENGELMAYER, District Judge:

      This case is the latest in a series of lawsuits—the fifth in this Court during the past four years—between two "Benihana" entities. Relevant here, Benihana, Inc. ("BI") has the right to operate the iconic Benihana restaurants within the United States, save in Hawaii, where Benihana of Tokyo, LLC ("BOT") has a contractual license from BI to do so. The past cases have centered on BI's claims that BOT, in operating a Benihana restaurant in Honolulu, has failed to comply with terms of its license agreement. For the most part, although not as to every particular, BI has prevailed in these cases. It has established a range of breaches in proceedings before this Court, before the United States Court of Appeals for the Second Circuit, and in arbitration. These breaches include serving unauthorized menu items, engaging in non-approved marketing, and failing to procure required insurance. BI has won temporary and permanent injunctive relief, and, as prevailing party, has been awarded substantial legal fees from BOT. Despite their animosity, BI and BOT remain joined together, in part as a result of a 2015 decision by a divided arbitral panel that determined BOT's breaches, while material, did not rise

to the level required under the parties' licensing agreement to justify BI's termination of BOT's license.

In this lawsuit, BOT attempts to turn the tables. It claims that to the limited extent that BI has been denied relief in past lawsuits, these overreaches bespeak an attempt by BI to improperly force BOT to sell itself or its Hawaii license to BI. And, BOT claims, since the most recent round of arbitration and litigation, BI has breached its duty under the parties' licensing agreement to reasonably approve menus and advertisements proposed by BOT. As relief, BOT seeks, in addition to money damages, the termination, in *its* favor, of the parties' license agreement, and the transfer to BOT of the unconditional right to operate Benihana restaurants in Hawaii and all associated intellectual property rights.

BOT originally filed this lawsuit in New York State Supreme Court in Manhattan. BOT brought two claims against BI, for breach of contract and breach of the covenant of good faith and fair dealing. It brought a third claim, for tortious interference with contract, against a party defendant new to these lawsuits: Angelo, Gordon & Co., L.P. ("AGC"), the investment bank that owns BI. Whereas BI (Delaware and Florida) and BOT (New York) were citizens of different diverse states, BOT's addition of AGC, a Delaware and New York citizen, destroyed diversity. BOT claimed that AGC was properly sued because it had caused—in acts allegedly constituting tortious interference with contract—BI to breach its obligations to BOT. BI, however, removed the case to this District. It asserted that the joinder of AGC was fraudulent, and motivated to avoid a forum—this Court—that had repeatedly found, and upheld arbitral findings of, breaches by BOT, and had awarded prevailing party fees to BI. BI alternatively justified removal on the ground that the relief BOT sought implicated federal questions under trademark law.

Now pending are the parties' cross motions.  BOT moves for remand to state court, arguing that joining AGC was not fraudulent and that the relief it seeks does not implicate a federal question.  BI and AGC, in turn, move to dismiss the claims against them under Federal Rule of Civil Procedure 12(b)(6).

For the following reasons, the Court denies BOT's motion to remand and grants BI's and AGC's motion to dismiss.

## I.  Background[1]

### A.  The History of, and the Agreements, Between BI and BOT

The Benihana enterprise is the brainchild of Hiraoki "Rocky" Aoki ("Rocky").  In 1964, Rocky, through BOT's predecessor, opened the first Benihana restaurant on West 56th Street in Manhattan.  Complaint ¶ 7.  The restaurants were the first in the United States to use *teppanyaki* cooking, a style of cuisine that uses an iron griddle to cook food.  Benihana restaurants seek to make entertainment an element of the meal experience, with the chef preparing the meal at an iron griddle located tableside.  Rocky devised the Benihana System, a standardized mode of

---

[1] The Court's summary of the facts is drawn from the Complaint, Dkt. 1, Ex. A ("Complaint") and other cognizable materials.  The Court treats all factual allegations in the Complaint as true, both in resolving the motion to remand, *see Wachtell, Lipton, Rosen & Katz v. CVR Energy, Inc.*, 18 F. Supp. 3d 414, 416 n.2 (S.D.N.Y. 2014) (citation omitted), and in resolving the motion to dismiss.  In addition, the Court considered various other documents in the record, including the Notice of Removal, Dkt. 1; the Arbitration Award, Dkt. 1, Ex. C ("Award"); the Declaration of Joshua A. Munn in Opposition to Plaintiff's Motion to Remand, Dkt. 36, and its attached exhibits; the Declaration of Patrick D. Bonner, Jr. in Support of Plaintiff's Motion to Remand, Dkt. 29 ("Bonner Decl."), and its attached exhibits; the Declaration of Patrick D. Bonner, Jr. in Opposition to Defendants' Motion to Dismiss, Dkt. 31, and its attached exhibits; and the Schedule referenced in § 8.02(d) of the ARA, Dkt. 50.  These materials are cognizable in considering a motion to remand, *see Wachtell, Lipton, Rosen & Katz*, 18 F. Supp. 3d at 416 n.2, and a motion to dismiss.  Several exhibits were filed by both parties; for ease of reference the Court cites only to one.  The Court also draws background information from its prior decisions resolving disputes between BI and BOT, including *Benihana of Tokyo, LLC v. Benihana Inc.*, 73 F. Supp. 3d 238 (S.D.N.Y. 2014), and *Benihana, Inc. v. Benihana of Tokyo, LLC*, No. 15 Civ. 7428 (PAE), 2016 WL 3913599 (S.D.N.Y. July 15, 2016).

operation involving similar recipes, advertising, service methods, ingredients and service to govern all Benihana restaurants.  *Id.*

Rocky founded two distinct "Benihana" companies—first BOT, and, later, in 1994, BI (a/k/a "Benihana America").  *Id.* ¶ 11.  Rocky initially owned and controlled both BOT and BI, although BI came to have outside investors, including AGC, a fund managed by which acquired control of BI in 2012.  BOT has remained controlled by the Aoki family and, following Rocky's death in 2008, its trust.  *Id.* ¶¶ 11, 24, 30.

In 1995, BI and BOT (or their predecessor entities) entered into two agreements relevant here.

The first, the Amended and Restated Agreement and Plan of Reorganization, *see* Bonner Decl., Ex. C ("ARA"), was executed on December 29, 1994 and amended on March 17, 1995.  It divided, between BI and BOT, the worldwide rights to operate Benihana restaurants.  The ARA gave BI the right to operate Benihana restaurants and use the Benihana trademarks in the United States, Central America, South America, and the Caribbean, which the ARA refers to collectively as the "Territory."  The ARA gave BOT the right to operate Benihana restaurants and to use the Benihana trademarks outside of the Territory.  ARA § 1.01(d).  The sole exception to this territorial division is Hawaii.  The ARA contemplated that BI would grant BOT a license to continue operating in Hawaii.  *Id.* § 8.02(d).

The ARA provides that each party will "use its best efforts to take, or cause to be done, all things necessary, proper or advisable under applicable laws and regulations to consummate and make effective the transactions contemplated by this Agreement."  *Id.* § 7.05.  Otherwise, however, the ARA does not regulate the working relationship between BI and BOT.  Nor does it

provide for a mechanism for the resolution of disputes, *e.g.*, through an arbitration clause or a choice of law clause.

The second agreement is the License Agreement, *see* Bonner Decl., Ex. B ("License Agreement").  Dated May 15, 1995, it granted BOT a perpetual, royalty-free license, subject to its terms, to operate Benihana restaurants in Hawaii.  There is currently only one such restaurant, established in 1971 and located in the Hilton Hawaiian Village in Honolulu.  BOT alleges that the Honolulu restaurant had sentimental value to Rocky, who realized there his vision of building a restaurant as a "gassho zukuri," a traditional Japanese farmhouse with a distinctive roof and robust wooden beams; Rocky built the restaurant from a 200-year-old farmhouse transported to Honolulu from Japan.  Complaint ¶ 8–9.  This restaurant was designed to appeal to Japanese tourists visiting Hawaii.  *Id.* ¶ 9.

The License Agreement sets out the terms governing BOT's operation of the Honolulu restaurant.  The terms govern such matters as the composition of the menu, the use of Benihana trademarks in Hawaii, advertising, food sales, insurance coverage, BI's right to terminate the agreement, dispute resolution, and choice of law (New York).  License Agreement, Arts. 5–8, 12–13, 17.7.

Several provisions are central here.

Article 5 governs BOT's use of the Benihana service marks and trade names.  It provides that "[a]ny and all advertising, publicity, signs, decorations, furnishings, equipment or other matter employing in any way whatsoever the words 'Benihana', 'Benihana of Tokyo' or the 'flower' symbol shall be submitted to [BI] for its approval prior to publication or use.  [BI] shall not unreasonably withhold approval for any such publication or use."  License Agreement, Art. 5.2.

Article 6 governs BOT's duty "to diligently operate the Restaurants in strict compliance" with the Benihana "System," including "menu selection." *Id.*, Art. 6.2. Article 6.3 states that BOT "shall sell or offer for sale only such products and services as have been expressly approved for sale in writing by [BI] (such approval shall not be unreasonably withheld)." *Id.*, Art. 6.3.

Article 8 provides that BOT covenants and agrees "[t]o advertise, sell or offer for sale only those items which are sold by [BI] in its company-owned restaurants or such other products as are approved by [BI] in writing, which shall not be unreasonably withheld, prior to offering the same for sale." *Id.*, Art. 8.1(c). BOT is required to carry comprehensive liability insurance, which names BI as an additional assured. *Id.*, Art. 8(e)(i).

As to defaults, the License Agreement provides that "any failure to comply with the covenants and agreements in this Article 8, or with covenants and agreements in Article 5 hereof with respect to the Marks . . . shall constitute a *material event of default* under this Agreement." *Id.*, Art. 8.4 (emphasis added). It further provides that any failure to comply with Articles 5 and 8 "would result in irreparable injury to [BI] for which no adequate remedy at law may be available, and, therefore, [BI] shall be entitled, in addition to any other remedies which it may have hereunder, at law or in equity, to obtain specific performance of, or an injunction against the violation of, the requirements of [Articles 5 and 8], without the necessity of showing actual or threatened damage." *Id.* In addition, "[BOT] agrees to pay all costs and expenses (including, without limitation, reasonable attorneys' fees) incurred by [BI] in connection with enforcement of this Article 8 or of Article 5 provided that [BOT] is determined to be the breaching party." *Id.*, Art. 8.5.

Finally, Article 12 provides for BI's right to terminate the License Agreement.  It lists

nine events "the occurrence of [which] shall constitute good cause for [BI], at its option and

without prejudice to any other rights or remedies provided for hereunder or by law or equity, to

terminate [the License] Agreement."  *Id.*, Art. 12.1.  For example, Article 12.1(g) provides, "If

[BOT] violates any [] substantial term or condition of this Agreement and [BOT] fails to cure

such violation within thirty (30) days after written notice from [BI] to cure same," then that

violation shall constitute "good cause" to terminate the agreement.  *Id.*, Art. 12.1.

The License Agreement provides for the resolution of disputes by arbitration.  Arbitration

is mandatory in the event of termination of the License Agreement.  *Id.*, Art. 13.1.  For all other

disputes, either party can elect arbitration, but arbitration is not mandatory—the parties may

instead seek relief in court.  *Id.*, Art. 13.2.  "Enforcement of any arbitration award, decision or

order may be sought in any court of competent jurisdiction."  *Id.*  All arbitrations between the

parties are to be settled by the American Arbitration Association ("AAA") in New York City in

accordance with the AAA's rules.  *Id.*, Arts. 13.1–13.2.

### B.      Prior Litigation and Arbitration About the Hawaii Restaurant

During the past four years, BI and BOT have engaged in a series of lawsuits and an

arbitration arising out of BOT's stewardship of the Hawaii restaurant and BI's claims that BOT

was breaching various terms of the License Agreement.

On May 6, 2013, BI notified BOT in writing that BI had learned that BOT was serving

hamburgers—called "Beni Burgers"—at the Honolulu restaurant.  BI noted that hamburgers

were not an authorized menu item and that BOT was required to obtain approval before selling

new menu items.  BI demanded that BOT remove the Beni Burgers from the menu.  On July 30,

2013, BI again notified BOT that it was in violation of certain terms of the License Agreement,

including through its unauthorized sale of hamburgers, and that BOT had 30 days to cure the violations. Following two extensions of the cure period, on September 24, 2013, BOT initiated an action in New York State Supreme Court, seeking a temporary restraining order to extend its time to cure its alleged breaches until after the conclusion of an arbitration proceeding, which had not yet commenced. BI removed that action to this Court. *See Benihana of Tokyo, LLC v. Benihana, Inc.*, No. 13 Civ. 6766 (PAE) (S.D.N.Y. 2013) ("*Benihana I*"), Dkt. 1.

On October 1, 2013, after an oral argument during which BOT conceded that its continued sale of hamburgers at the Hawaii restaurant was not permitted by the Licensing Agreement, this Court, in a lengthy bench ruling, denied BOT's application for a restraining order extending its time to cure the breaches. The Court found that BOT, far from showing a likelihood of success on the merits, was not likely to prevail on the merits, and appeared in breach of multiple provisions of the License Agreement, including by selling hamburgers at the Hawaii restaurant. *Benihana I*, 13 Civ. 6766, Dkt. 10, at 26–36.

Following the Court's decision, despite its counsel's representation that BOT would no longer sell hamburgers at the Hawaii restaurant, BOT continued to sell hamburgers there. These were sold under various names, such as the "Beni Burger," "Classic Burger," "Tempura Burger," and the "Tokyo Burger." BOT also continued to sell the "Beni Panda," a children's dish containing a molded circle of vegetable fried rice, ingredients atop the rice resembling a smiley face, and two mini hamburger patties positioned around the rice circle in an evocation of the ears of a panda bear. On December 13, 2013, BI again notified BOT of these and other asserted breaches of License Agreement terms, including terms regarding advertising and insurance. BOT, in turn, on January 13, 2014, commenced the arbitration proceeding, seeking a declaration that it was not in default under the License Agreement.

8

On February 5, 2014, BI, having discovered that BOT was continuing to sell hamburgers from the Honolulu restaurant, sent BOT a notice of termination of the License Agreement, effective February 15, 2014. BI asserted good cause for the termination under Article 12.1 of the License Agreement based on both (1) BOT's failure to cure within 30 days and (2) three notices of default within 12 months.[2]

On February 7, 2014, BI filed in this Court a petition for a preliminary injunction in aid of the arbitration that BOT had initiated. BI sought to enjoin BOT—pending conclusion of the arbitration—from (1) selling hamburgers at the Honolulu restaurant and (2) using unauthorized advertisements there, in violation of the License Agreement. *See Benihana Inc. v. Benihana of Tokyo, LLC*, No. 14 Civ. 792 (PAE) (S.D.N.Y. 2014) ("*Benihana II*"). This time, BOT sought to justify its sale of hamburgers, arguing that these sales of hamburgers did not breach the License Agreement because (1) although the hamburgers were cooked in the restaurant's kitchen, they were served to customers immediately outside the restaurant in its patio area, and (2) the Beni Panda was not actually a burger *per se* but, notwithstanding its inclusion of two unadorned burger patties, was instead a fried rice dish.

On February 26, 2014, the Court rejected BOT's arguments, again in a lengthy bench decision. The Court held that BI was likely to succeed on its claims of material breaches of the License Agreement, based both on BOT's sale of burgers and its unapproved advertisements. *See Benihana II*, Dkt. 19, at 42–44, 47–50. The Court granted BI a preliminary injunction. It enjoined BOT from selling hamburgers or other unauthorized food items in connection with the

---

[2] The License Agreement provides, *inter alia*, that it may be terminated if "[BOT] violates any other substantial term or condition of this Agreement and [BOT] fails to cure such violation within thirty (30) days after written notice from [BI] to cure same," License Agreement Art. 12.1(g), or if "[BI] gives [] three (3) notices of any default hereunder (and such defaults are thereafter cured), within any consecutive twelve (12) month period," *id.* Art. 12.1(h).

Hawaii restaurant, and from advertising in certain ways without BI's approval. *See id.*, Dkt. 17.
On BOT's appeal, the Second Circuit upheld this relief, holding, *inter alia*, that "far from
committing merely trivial violations, Benihana of Tokyo was 'blatantly not complying with the
license agreement' . . .  Benihana of Tokyo continued to flout the terms of the [License]
Agreement, relying on, as the district court aptly put it, 'justifications utterly and unusually
unconvincing' such as that burgers with rice and shaped as 'panda ears' are not burgers.  The
menu item and advertising restrictions of the [License] Agreement were clear, and Benihana of
Tokyo was clearly violating them." *Benihana, Inc. v. Benihana of Tokyo, LLC*, 784 F.3d 887,
895–97 (2d Cir. 2015) (internal citations and modifications omitted).[3]

The arbitration commenced by BOT then moved forward.  Whereas BOT sought a
declaration that it was not in default, BI filed a counterclaim asking the arbitrators to affirm as
consistent with the License Agreement BI's decision to terminate the License Agreement on
account of BOT's defaults.  BI sought an award of damages, fees, costs, and other remedies.
Pursuant to the arbitration provisions in the License Agreement, BOT and BI each appointed an
arbitrator, and the two party-appointed arbitrators selected a third arbitrator to chair the panel.
The panel held hearings on June 2–5, 2015, in New York City.

On September 18, 2015, the panel issued the Award.  The panel unanimously found that
BOT had committed three material breaches of the License Agreement, two involving the sale an
advertisement of hamburgers in breach of Article 8.1(c) of the License Agreement, and the third

---

[3] This Court had also enjoined BOT from arguing to the arbitration panel that, were it to find that
BOT had breached the License Agreement, BOT should be permitted to cure its defaults outside
the 30-day period provided by the License Agreement.  As to that one aspect of the preliminary
injunction, the Second Circuit reversed.  It held that the License Agreement's broad language
committed to the arbitral panel the decision whether the agreement permitted a cure period of
more than 30 days. *Benihana, Inc.*, 784 F.3d at 897–902.

involving the failure to name BI as an additional assured, as required by Article 8.1(e)(i).  Award ¶¶ 59, 68–71.  But, the panel majority, 2-1, interpreted Article 13.1 of the License Agreement to authorize termination only when (1) BI had a right a right to terminate *and* (2) the termination was independently "reasonable."  And, the panel majority found, while BOT's material breaches gave BI a right to terminate, termination of the License Agreement was not reasonable.  Award ¶ 85.  Specifically, the panel majority found, given that the parties who negotiated the License Agreement anticipated that BOT would hold a license to operate the Honolulu, terminating it for these breaches fell short of being reasonable, which the panel construed to mean "fair proper, or moderate under the circumstances; sensible."  *Id.* ¶ 88 (quoting Black's Law Dictionary (10th ed. 2014)).

The dissent, in strong terms, contested the panel majority's construction of the License Agreement.  It noted, *inter alia*, that under established New York contract law, a party had the right to terminate a license agreement upon commission of a material breach, such that the panel majority was wrong to undertake a freestanding and subjective inquiry into the reasonableness of termination.  *Id.*, Dissent ¶¶ 1–12.  In lieu of termination, the panel issued a permanent injunction against BOT, enjoining it from breaching the practices at issue.  Award ¶ 119.  The panel also, unanimously, awarded BI attorneys' fees and costs of $1,130,643.80, finding that BOT had been the breaching party and that BI was entitled to partial reimbursement of its attorney's fees as the prevailing party.  *Id.* ¶ 120.

On September 18, 2015, BI filed a petition in this Court, seeking partial confirmation and partial vacatur of the Award.  It sought to confirm the panel's fee award to BI, but sought vacatur of the divided panel's determination that BI's termination of the License Agreement had been unauthorized.  On July 15, 2016, this Court confirmed the fee award and the injunctive relief put

11

in place by the panel.  The Court—relying on the broad latitude given to arbitrators to construe parties' agreements—did not vacate the panel majority's determination that BI's termination of BOT was not justified under the License Agreement.  In so ruling, however, the Court found the dissenting arbitrator's construction and application of the provisions relating to termination far the more persuasive.  Indeed, the Court stated, whether to vacate this aspect of the arbitral award had given the Court "considerable pause" and "presented a genuinely close question."  *Benihana, Inc. v. Benihana of Tokyo, LLC*, No. 15 Civ. 7428 (PAE), 2016 WL 3913599, at *24 (S.D.N.Y. July 15, 2016).  The Court also upheld the panel's award of fees and costs to BI.  And it emphatically denied BOT's motion for Rule 11 sanctions against BI, which BOT had claimed were warranted based on BI's attempt—which BOT claimed was frivolous—to vacate the aspect of the award finding termination unreasonable.  In fact, the Court held, BOT's motion for sanctions "came far closer than BI's bid for partial vacatur to meriting such sanctions."  *Id.*

### C.    This Lawsuit

On April 13, 2016, BOT brought this action in New York State Supreme Court.  BOT's Complaint alleges that after 2008, when Rocky died, and particularly after 2012, when one of AGC's funds acquired BI, BI and AGC resolved to purchase BOT, but that BOT resisted their overtures.  Complaint ¶¶ 30–32.  The Complaint alleges that BI, encouraged by AGC, then embarked on a scheme to force termination of the License Agreement.  BI's and AGC's motive to do so, BOT's Complaint alleges, was to force the sale to BI of BOT:  If BOT were forced to "relinquish its most valuable asset—the Honolulu Benihana of Tokyo" and to "spend substantial sums of money on legal fees," these would "drive BOT's price down."  Complaint ¶ 35.[4]

---

[4] At the same time, the Complaint alleges, BI mismanaged and underfunded its own operations, *see, e.g.*, Complaint ¶¶ 33–34, the evident implication being that acquiring BOT would give BI an alternative way to grow.  *Id.* ¶ 34.

BOT's Complaint contains two categories of allegations towards this end.

*First*, it recasts the recent lawsuits and arbitration between BI and BOT as reflecting—notwithstanding BI's record in them of substantial, if not overwhelming, success—wrongful conduct by BI.  The Complaint thus claims that BOT had been "confused" by BI's refusal to approve sales of hamburgers at the Honolulu restaurant, *id.* ¶ 36; and that when BOT persisted in selling hamburgers in the face of this Court's ruling that BOT was forbidden to do so without BI's permission, BOT had not intended to breach the Licensing Agreement, but had acted based on "erroneous" advice of a lawyer whom BOT has since sued for malpractice, *id.* ¶ 38.  The Complaint further claims that BOT was surprised when BI exercised its contractual right under the License Agreement to review new menu items and advertisements.  *Id.* ¶ 37.

As for the 2015 arbitration which BOT had initiated—the panel's decision in which was under review by this Court at the time BOT filed its Complaint[5]—the Complaint depicts BI's conduct in that arbitration as wrongful.  Complaint ¶¶ 40–51.  BOT alleges that BI refused to make a "fair offer" to settle the dispute, because arbitrating would drive up BOT's costs.  *Id.* ¶ 44.  It claims that BI took unreasonable positions in the arbitration, including asserting that BOT had been required to seek permission for a performance at the Honolulu restaurant by a dance team, the "Beni Girls," *id.* ¶¶ 45–46.  It claims that, after it gave BOT notice of termination but while BOT continued to operate the restaurant pending arbitration, BI wrongfully refused to approve BOT's proposed menus and advertisements.  *Id.* ¶ 47.  BOT also faults a representative of AGC and BI for refusing to meet with Rocky's widow, Keiko Aoki,

---

[5] Argument on BI's petition was held before this Court on January 20, 2016.  Although the Court did not reveal its ultimate outcome at argument, the Court stated that BI's bid for vacatur was colorable, and that BOT's request for attorneys' fees on the theory that BI's bid was frivolous and sure to be denied.  Hearing Transcript, January 20, 2016, 15 Civ. 7428 (PAE), at 68–69.

during the arbitration.  *Id.* ¶ 50.  As to the arbitral outcome, BOT's Complaint notes that the

panel majority found that, "no matter the magnitude of any breach on BOT's part, BI's

termination was required to be reasonable," and that BI's decision to terminate the License

Agreement had been "unreasonable and therefore invalid."  *Id.* ¶ 51.  And while the Complaint

acknowledges the panel's finding of material breaches by BOT, it claims that the unfair result of

BI's successful enforcement of the License Agreement was that "BOT was forced to pay a

portion of BI's legal fees—which amounted to more than one million dollars."  *Id.*

    *Second*, BOT alleges that BI and AGC developed a scheme, after the arbitration, in which

BI would refuse to uphold its "contractual obligation to reasonably approve BOT's menu and

ads" at its Hawaii restaurant, in breach of the License Agreement.  *Id*. ¶ 53.  BOT alleges that it

paid BI the roughly $1.1 million fee award ordered by the arbitrators and has "endeavored to

comply with the terms of the permanent injunction and its obligations under the license

agreement."  *Id.* ¶ 52.  But, it alleges, BI has refused to approve BOT's proposed menu items or

ads.  For example, on November 24, 2015, BOT submitted ads to BI and requested approval.  *Id.*

¶ 57.  The next day, on November 25, 2015, BI replied, stating that it would not approve any of

BOT's proposed print ads.  *Id.* ¶ 58.  As a result, "[i]t became clear to BOT that BI, together with

AGC, intended to render it impossible for BOT to comply with the license agreement, and that

BI had no intention of complying with its own contractual obligations."  *Id.*

    The Complaint quotes correspondence between executives and counsel at BOT and BI

during late 2015 and 2016 regarding menu items and ads which BI allegedly refused to approve.

*Id.* ¶¶ 54–76.  It further alleges that BOT sought guidance on how to gain BI's approval of such

materials, but that BI was dilatory in sending guidance.  For example, in a February 11, 2016

letter, a BI executive declined to approve any of BOT's proposed ads, and gave BOT a copy of

BI's "Brand Style Guide."  This contained specifications for using the Benihana logo, such as the proper fonts, for advertising purposes, guidance that "BOT had been requesting . . . for months." *Id.* ¶ 65.  But, BOT alleges, this guidance was not a marketing plan or an advertising template, and thus was of limited value.  *See id.*  BOT also alleges that BI faulted BOT's current menu as having "too many issues" to be listed by BI, and instead "recommended that BOT simply work from BI's current menu . . . and request approval for any deviations."  *Id.*  "Although BI was finally providing a modicum of guidance, its failure to approve BOT's menus and ads remained unreasonable."  *Id.*

Similarly, BOT alleges, BI unreasonably denied approval of its terrace menu.  On March 2–3, 2016, a BOT executive emailed BI executives seeking approval of—or comments upon— BOT's longstanding take-out and terrace menus.  *Id.* ¶¶ 70–71.  On March 8, 2016, a BI executive responded, stating that BI would not approve the menu, because any take-out menu must include the same items as the dining room menu, not a limited selection.  *Id.* ¶ 72.  BI did not explain the basis for this requirement.  *Id.*  BI also allegedly refused to approve BOT's terrace menu, stating that, as at BI's restaurants, only a dining room menu and a lounge menu were to be offered.  *Id.*  BI stated that its goal was to maintain uniform menus across all Benihana restaurants, even though, BOT alleges, "BI frequently permits its own franchisees to offer menus and menu items that differ (sometimes vastly) from its own menus. . . ."  *Id.*  The Complaint alleges other such refusals by BI.

As to AGC, the Complaint alleges generally that BI acted in coordination with AGC to make it impossible for BOT to comply with the License Agreement.  *See id.* ¶ 53; *see also id.* ¶ 77 ("BI and AGC, acting together and in bad faith, are rendering it impossible for BOT to comply with the [L]icense [A]greement.").  It alleges that AGC acquired BI believing it could

also acquire BOT and its worldwide trademarks and rights to operate Benihana restaurants. *Id.* ¶ 30. It alleges that after BI and AGC's overtures to buy BOT were unsuccessful, *id.* ¶¶ 31–32, 35, BI retaliated by claiming violations of the License Agreement in connection with the operation of the Hawaii restaurant. *Id.* ¶ 36. It alleges that, to further the goal of forcing a sale of BOT, AGC instigated the ensuing arbitration and litigations.

In alleging a breach of contract, BOT's Complaint alleges that BI breached the ARA, the sole agreement under which BOT sues. While BOT recites that BI's conduct also breached the License Agreement, BOT alleges that these breaches are actionable under the ARA, insofar as the ARA "obligates BI to use its best efforts to do all things necessary, proper or advisable to make the ARA effective." *Id.* ¶ 77. BOT alleges that because "the ARA's effectiveness depends in part on the [L]icense [A]greement," a breach of the License Agreement also constitutes a breach of the ARA. *Id.*; *see also id.* ¶ 78. BOT's claim against AGC of tortious interference is based on AGC's alleged encouragement of BI to breach the ARA.

### D. Procedural History of This Case

On May 20, 2016, BI timely filed a notice of removal in this Court. Dkt. 1. On May 27, 2016, BI and AGC moved to dismiss, Dkt. 8, filing a memorandum of law in support, Dkt. 9. On July 11, 2016, BOT moved to remand this action to New York State Supreme Court, Dkt. 27 ("BOT Remand Br."). It filed a memorandum of law, and the Bonner Decl., in support, Dkts. 28–29; BOT also filed a memorandum of law in opposition to the motion to dismiss, and a second declaration from Mr. Bonner. Dkts. 30–31. On August 1, 2016, defendants filed a reply in support of the motion to dismiss, Dkt. 34, and a memorandum of law in opposition to BOT's motion to remand, Dkt. 35, along with a declaration from Joshua A. Munn, Dkt. 36. On October 14, 2016, the Court heard argument on these motions. *See* Dkt. 45.

## II.      Discussion

BOT brings three claims: (1) against BI, for breach of the ARA, based on BI's having "unreasonably and repeatedly withheld its approval for BOT's menus," thereby breaching its duty under the ARA to use "its best efforts to do all things necessary, proper or advisable to make the ARA effective," Complaint ¶¶ 80–86; (2) against BI, for breach of the implied covenant of good faith and fair dealing by BI, based on BI's failure in good faith to comply with its ARA duty to comply with the License Agreement, *id.* ¶¶ 87–91; and (3) against AGC, for tortious interference with contract, based on its alleged participation with BI in BI's breach of the ARA as alleged in the first claim, *id.* ¶¶ 92–96.

BOT moves to remand to state court on the ground that its joinder of AGC was not fraudulent and that its claim for relief does not present a federal question.  BI moves to dismiss on the ground that BOT's breach of contract claim fails to adequately allege breach, damages, or its own performance; that BOT's claim for breach of the covenant of good faith and fair dealing is fatally duplicative of the breach of contract claim; and that the tortious interference claim against AGC is barred by the economic interest defense.

The Court first addresses the motion to remand.  Because the Court denies that motion, finding that AGC was fraudulently joined, the Court then addresses the motion to dismiss.

### A.      BOT's Motion to Remand

BI argues that removal was proper for two reasons.  First, there is diversity jurisdiction, because defendant AGC, without which there would be complete diversity, was fraudulently joined.  Alternatively, BI argues, BOT's claims arise under federal law, because the relief BOT seeks—transfer to BOT from BI of the rights to the Benihana trademarks and all intellectual property rights in Hawaii—would require bifurcating federally protected rights along territorial

lines, implicating significant issues of federal law.  *See Grable & Sons Metal Prods. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 312–14 (2005).  Because the Court finds that AGC was fraudulently joined such that there is diversity jurisdiction, the Court does not reach BI's alternative argument regarding federal question jurisdiction.

### 1.     Applicable Legal Standards

"[A]ny civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or the defendants, to the district court of the United States for the district and division embracing the place where such action is pending."  28 U.S.C. § 1441(a).  District courts have original jurisdiction over cases "between . . . citizens of different states," where the amount in controversy exceeds $75,000.  *Id.* § 1332(a).  Diversity jurisdiction under § 1332(a) "requires complete diversity between all plaintiffs and defendants."  *Pampillonia v. RJR Nabisco Inc.*, 138 F.3d 459, 460 (2d Cir. 1998).  On a motion to remand, "the defendant bears the burden of demonstrating the propriety of removal."  *Cal. Pub. Employees' Ret. Sys. v. WorldCom, Inc.*, 368 F.3d 86, 100 (2d Cir. 2004) (internal quotation marks and citation omitted).

### 2.     Analysis

For diversity purposes, BOT is a citizen of New York, *see* Complaint ¶ 1; AGC, of Delaware and New York, *see id.* ¶ 2; and BI, of Delaware and Florida, *see id.* ¶ 3.[6]  Joinder of AGC, if proper, therefore destroys diversity of citizenship and thereby BI's ability to remove this case on that ground.  *See Pampillonia*, 138 F.3d at 460.

---

[6] BOT's claim of damages of $3 million, *id.* ¶¶ 86, 91, 96, satisfies the $75,000 amount in controversy requirement of 18 U.S.C. § 1332.

A plaintiff, however, "may not defeat a federal court's diversity jurisdiction and a defendant's right of removal merely by joining as defendants parties with no real connection with the controversy." *Id.* at 460–61.  "In order to show that naming a nondiverse defendant is a 'fraudulent joinder' effected to defeat diversity, the defendant must demonstrate, by clear and convincing evidence, either that there has been outright fraud committed in the plaintiff's pleadings, or that there is no possibility, based on the pleadings that a plaintiff can state a cause of action against the non-diverse defendant in state court." *Id.* at 461.  The burden of proving fraudulent joinder is "heavy." *Id.*  There must be "no recovery under the law of the state on the cause alleged. . . .  Any possibility of recovery, even if slim, militates against a finding of fraudulent joinder[.]" *Nemazee v. Premier, Inc.*, 232 F. Supp. 2d 172, 178 (S.D.N.Y. 2002) (internal quotation marks omitted); *see also Stan Winston Creatures, Inc. v. Toys "R" Us, Inc.*, 314 F. Supp. 2d 177, 183 (S.D.N.Y. 2003) (finding of fraudulent joinder appropriate only when it is "legally impossible" for plaintiff to state a claim under state law).  In evaluating whether a defendant has been fraudulently joined, "all factual and legal issues must be resolved in favor of the plaintiff." *Pampillonia*, 138 F.3d at 461.

BI and AGC do not argue that BOT's pleadings reflect an outright fraud.  They argue instead that recovery on BOT's claim of tortious interference—the sole claim brought against AGC—is legally impossible under New York law such that this claim is "*per se* precluded," *Nemazee*, 232 F. Supp. 2d at 178.  The Court, therefore, examines whether BI and AGC have shown by clear and convincing evidence that BOT cannot state such a claim against AGC.

BOT's Complaint alleges that AGC, through one of its funds, acquired BI, and then encouraged BI to breach the License Agreement, by unreasonably denying approval of BOT's menus and ads.  AGC's goal in doing so, as alleged, was to drive down BOT's market value and

to induce a sale of BOT to BI.  Complaint ¶¶ 6, 30–36.  BI and AGC argue that BOT cannot

possibly state a claim for tortious interference with contract because the economic interest

defense to such a claim necessarily applies.

Under New York law, tortious interference with contract "requires the existence of a

valid contract between the plaintiff and a third party, defendant's knowledge of that contract,

defendant's intentional procurement of the third-party's breach of the contract without

justification, actual breach of the contract, and damages resulting therefrom."  *Lama Holding Co.*

*v. Smith Barney Inc.*, 668 N.E.2d 1370, 1375 (N.Y. 1996).  In developing the contours of this

tort, the New York courts have sought "to strike a balance between two valued interests:

protection of enforceable contracts, which lends stability and predictability to parties' dealings,

and promotion of free and robust competition in the marketplace."  *White Plains Coat & Apron*

*Co., Inc. v. Cintas Corp.*, 867 N.E.2d 381, 383 (N.Y. 2007).

As a result, New York courts have developed the "economic interest defense" to claims

of tortious interference with contract.  The defense applies when the defendant "acted to protect

its own legal or financial stake in the breaching party's business."  *Id.*  Unless there is a showing

of malice or illegality, a defendant's economic interest in the breaching party's affairs bars an

action for tortious interference with contract.  *Foster v. Churchill*, 665 N.E.2d 153, 156–57 (N.Y.

1996).  Thus, when a complaint supports a defendant's economic interest in the breaching party's

business, it is "insufficient" for a complaint merely to allege the elements of tortious

interference; rather, "the plaintiff must also adequately allege that the defendant either acted

maliciously, fraudulently, or illegally."  *IMG Fragrance Brands, LLC v. Houbigant, Inc.*, 679 F.

Supp. 2d 395, 405–06 (S.D.N.Y. 2009) (citing, *inter alia*, *Staehr v. Hartford Fin. Servs. Grp.,*

*Inc.*, 547 F.3d 406, 425 (2d Cir. 2008) ("[A] defendant may raise an affirmative defense in a pre-answer Rule 12(b)(6) motion if the defense appears on the face of the complaint.")).

In the foundational case of *White Plains*, *supra*, the New York Court of Appeals explained that the purpose of the economic interest defense is to enable a defendant to claim that it "acted to protect its own legal or financial stake in the breaching party's business." 867 N.E.2d at 383. The New York Court of Appeals there supplied a non-exhaustive list of contexts in which the defense applies: "for example, where defendants were significant stockholders in the breaching party's business; where defendant and the breaching party had a parent-subsidiary relationship; where defendant was the breaching party's creditor; and where the defendant had a managerial contract with the breaching party at the time defendant induced the breach of contract with plaintiff." *Id.* at 383–84; *see also Felson v. Sol Cafe Mfg. Corp.*, 249 N.E.2d 459, 461 (N.Y. 1969) (noting, in context of defendant who was a stockholder in breaching party, the broad application of the defense); *Don King Prods., Inc. v. Smith*, 47 F. App'x 12, 15 (2d Cir. 2002) (summary order) (defense is available when the defendant "was acting [] to protect *its own economic interest* in that breaching party" or to protect the economic interest of the breaching party (emphasis in original)). The defense does not, however, apply where the third party is a competitor of the plaintiff, because this role does not entail a "legal or financial stake in the breaching party's business that permits defendant's inducement of a breach of contract." *White Plains*, 867 N.E.2d at 384.

Here, as pleaded, AGC possesses an economic interest in BI sufficient under *White Plains* to defeat a claim for tortious interference with contract absent allegations of malice, fraud, or illegality. The Complaint alleges that AGC is a private registered investment advisor dedicated to alternative investing, managing $26.5 billion with more than $1 billion in private

equity investments.  Complaint ¶ 29.  In 2012, it alleges, one of AGC's funds acquired BI.  *Id.*
¶ 30.  The Complaint further alleges that, "before BI was acquired by AGC," AGC was told that
it would be able also eventually to purchase BOT, and that "AGC acquired BI based on the belief
that it could also acquire BOT."  *Id.*  Further, it alleges, "soon after acquiring BI at the end of
2012," one of AGC's managing directors met with Keiko Aoki, Rocky's widow and BOT's
CEO, to express "AGC's desire to purchase BOT."  *Id.* ¶ 31.  The managing director explained
that AGC "had completed a partial leveraged buyout of BI and paid $300 million for the
company, but immediately sold off $50 million of BI's real estate after the closing."  *Id.*  The
managing director told Keiko Aoki that AGC's "investments usually culminated within 4–5
years, and that AGC was required to pay an 8% annual return to its investors," and that
"acquiring BOT was a necessary part of AGC's business plan and that it made sense for BOT
and BI to become one company."  *Id.*  The Complaint alleges that AGC's managing director
promised that "AGC would offer a good price for BOT" and represented that "AGC needed to
purchase BOT in order to provide its promised return to its investors" such that "[w]ithout BOT,
AGC's business plan would fail."  *Id.*  AGC, the Complaint alleges, "intended to take Benihana
public again or sell it to a third party."  *Id.*  The Complaint explains that Ms. Aoki declined the
offer, telling the AGC managing director "that she understood why AGC wanted to buy BI, but
BOT had no reason to sell."  *Id.*

These allegations easily suffice to bring AGC within the ambit of the economic interest
defense.  Simply put, as alleged, AGC owned BI.  AGC thus had an interest in BI's performance
both in general and in connection with BOT:  in BI's overall course of dealings with BOT, with
whom BI allocated worldwide rights to operate the Benihana franchise and with whom it jointly
controlled common trademark and other intellectual property rights; in BI's enforcement of its

License Agreement with BOT; and in the possibility of a future combination of BI with BOT, which, as pleaded, AGC had openly identified as a vehicle for enhanced profitability.  And BOT's Complaint, while accentuating AGC's harmful business decisions with respect to BI, vividly illustrates how AGC, motivated by its stake in BI, used its ownership of BI to shape its direction.  It alleges that under AGC's direction, BI took actions that harmed the Benihana brand, and hurt restaurant operations and the overall Benihana business.  *See, e.g.*, Complaint ¶ 33 ("[U]nder AGC's ownership, AGC and BI have employed cost-cutting measures, including firing the most experienced managers and cutting staff" and that "[as] a result of AGC and BI's cost-cutting measures, many of BI's franchisees have opted to discontinue their franchises."); *id.* (AGC's and BI's actions "have prioritized financial gain over protecting the Benihana System and the high standard Mr. Aoki himself created, [harming] the Benihana brand worldwide, to BOT's detriment."; *id.* ¶ 34 (as a result of AGC's and BI's business decisions, "BI's business has failed to live up to AGC's forecasts" and "AGC and BI have lost restaurants."); *id.* (in 2014, "under increasing pressure to achieve its promised growth—and unable to acquire BOT—AGC fired BI's top management.").[7]

The Complaint thus not only amply alleges AGC's economic stake in BI.  It also alleges in some detail the control that came with that stake.  As alleged, AGC set BI's strategy and investment plan, and helped shape the conduct of BI's business, including with respect to cost-cutting measures and the retention or termination of personnel, including top BI management.  And the Complaint alleges that a key aspect of AGC's plan for its investment in BI related to

---

[7] At argument, BOT represented that members of AGC serve as directors of BI, helping to explain how AGC has used its ownership of BI to steer its direction.  Oral Argument Transcript, October 14, 2016, Dkt. 45 at 35.

BOT, in particular, AGC's desire to unify the Benihana entities through an acquisition of BOT, which would in turn enhance its investment, including potentially through going public. The Complaint thus itself alleges, clearly and convincingly, AGC's economic interest in BI. The Complaint, while alleging—conclusorily—that AGC encouraged BI to violate its duties under the License Agreement,[8] is devoid of any allegations that AGC "acted maliciously, fraudulently, or illegally." *IMG Fragrance Brands*, 679 F. Supp. 2d at 405–06. Therefore, the Court finds, by clear and convincing evidence, that the economic interest defense applies here, thereby precluding the claim of tortious interference that is the sole barrier to the exercise of diversity jurisdiction.

BOT's sparse argument in response is unpersuasive. It asserts that, as a matter of law, the economic interest defense applies only in discrete and limited circumstances, such as when the defendant is a significant or sole stockholder or has a parent-subsidiary relationship with the breaching party. BOT Remand Br. at 8. And AGC, it notes, does not directly own BI in the manner of a stockholder, but does so through an intermediary, a fund that AGC manages. *See id.*; Bonner Decl., Ex. D.

BOT, however, does not offer any case law so cabining the economic interest doctrine. And the New York Court of Appeals' discussion of the defense in *White Plains* is to the contrary. Far from adopting mechanistic or technical qualifications for the defense to apply, the Court of Appeals there reasoned that the touchstone of the defense is that the defendant "acted to

---

[8] Revealingly, in the portion of the Complaint that chronicles BI's post-arbitration actions with respect to BOT's menus and advertisements that are alleged to have violated the License Agreement, *see* Complaint ¶¶ 52–75, there are no concrete factual allegations whatsoever about AGC. The Complaint instead conclusorily alleges that BI was at all times "[a]cting together with AGC" to breach the License Agreement. *See, e.g.*, *id.* at III (header to the section, beginning with ¶ 52, recounting BI's alleged breaches).

protect its own legal or financial stake in the breaching party's business"; the court noted that the defense accordingly had been applied in a range of situations, including when the defendant had a managerial contract with the breaching party at the time of the breach.  *See White Plains*, 867 N.E.2d at 383–84.  BOT's allegations here regarding AGC are of such a nature.  As noted, they convincingly reflect that AGC, including in attempting to gain control by BI of BOT, was acting to protect and enhance its economic interest in BI and an enhanced return for its own investors. *See, e.g.*, Complaint ¶ 31; *see also Don King Prods.*, 47 F. App'x at 15 (defense applies when the third-party defendant "was acting [] to protect *its own economic interest* in that breaching party," not merely the economic interest of the breaching party) (emphasis in original).

Accordingly, the Court finds, by clear and convincing evidence, that the economic interest doctrine bars BOT's claim against AGC for tortious interference.  It follows that AGC was fraudulently joined in this lawsuit.  The Court therefore upholds BI's removal as proper and denies BOT's motion for remand.  The Court also necessarily must dismiss BOT's claim against AGC for tortious interference with contract, for failure to state a claim.

### B.      BI's Motion to Dismiss

In moving to dismiss for failure to state a claim, BI argues that (1) BOT's claim for breach of contract fails for failure to adequately allege breach, damages, or its own performance, and (2) BOT's claim for breach of the covenant of good faith and fair dealing fails because it wholly duplicates the breach of contract claim.

### 1.      Applicable Legal Standards

To survive a motion to dismiss for failure to state a claim for which relief can be granted under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial

plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).

In considering a motion to dismiss, a district court must "accept[] all factual claims in the complaint as true, and draw[] all reasonable inferences in the plaintiff's favor." *Lotes Co. v. Hon Hai Precision Indus. Co.*, 753 F.3d 395, 403 (2d Cir. 2014) (quoting *Famous Horse Inc. v. 5th Ave. Photo Inc.*, 624 F.3d 106, 108 (2d Cir. 2010) (internal quotation marks omitted)). However, this tenet is "inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* "[R]ather, the complaint's *[f]actual* allegations must be enough to raise a right to relief above the speculative level, *i.e.*, enough to make the claim plausible." *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (quoting *Twombly*, 550 U.S. at 555, 570) (internal quotation marks omitted) (emphasis in *Arista Records*). A complaint is properly dismissed where, as a matter of law, "the allegations in [the] complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558.

## 2.    Breach of Contract

Under New York law, a cause of action for breach of contract requires "(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of the contract by the defendant, and (4) damages." *Eternity Glob. Master Fund Ltd. v. Morgan Guar. Trust Co. of New York*, 375 F.3d 168, 177 (2d Cir. 2004) (quotation omitted); *see also Palmetto Partners, L.P. v. AJW Qualified Partners, LLC*, 83 A.D.3d 804, 806 (N.Y. App. Div. 2d Dept.

2011) (same).  The plaintiff must allege the specific provisions of the contract upon which liability is predicated.  *Sud v. Sud*, 211 A.D.2d 423, 424 (N.Y. App. Div. 1st Dept. 1995).  It is a fundamental principle of contract law that agreements are interpreted in accordance with the parties' intent, and the best evidence of the parties' intent is what they expressed in their written contract.  *Schron v. Troutman Sanders LLP*, 986 N.E.2d 430, 433 (N.Y. 2013).[9]

BOT's breach of contract claim against BI is brought solely under the ARA, the March 1995 agreement which effected the territorial allocation of restaurants and intellectual property rights between BOT and BI.  *See* Complaint ¶¶ 80–86.  The Complaint identifies one ARA provision as having been breached: that which "obligates BOT and BI to use their best efforts to do all things necessary, proper or advisable to make the ARA effective."  *Id.* ¶ 82.  The provision to which the Complaint thus refers is ARA § 7.05, which, in full, provides:

> **Section 7.05   Best Efforts**.  Subject to the terms and conditions herein provided, each of the parties hereto agrees to use its best efforts to take, or cause to be done, all things necessary, proper or advisable under applicable laws and regulations to consummate and make effective the transactions contemplated by this Agreement.  In case at any time after the Effective Time any further action is necessary or desirable to carry out the purposes of this Agreement, the proper officers and directors of each party to this Agreement shall take all such necessary action.

ARA § 7.05.

---

[9] A written contract that is unambiguous on its face is enforced according to the plain meaning of its terms.  Parol evidence—evidence outside a contract's four corners—is not admissible unless the court determines that the contract is facially ambiguous.  *Schron*, 986 N.E.2d at 433. (quotation omitted).  A contract is unambiguous if on its face it is "reasonably susceptible of only one meaning[.]"  *Selective Ins. Co. of America v. Cty. of Rensselaer*, 47 N.E.3d 458, 461 (N.Y. 2016) (quotation omitted).  Whether a contract is ambiguous "is an issue of law for the courts to decide," *Innophos, Inc. v. Rhodia, S.A.*, 882 N.E.2d 389, 392 (N.Y. 2008) (quotation omitted); that the parties interpret a contract provision differently does not make it ambiguous. *CT Investment Management Co., LLC v. Chartis Specialty Ins. Co.*, 130 A.D.3d 1, 6–7 (N.Y. App. Div. 1st Dept. 2015).

Notably, however, the actions by BI on which BOT's Complaint bases its claim of breach of the ARA are actions, BOT states, that contravened the License Agreement. The Complaint alleges that, although BOT ostensibly "substantially complied" with the License Agreement, Complaint ¶ 84, BI has "unreasonably and repeatedly withheld its approval for BOT's menus and ads," in violation of the provisions of the License Agreement, Arts. 6.2 and 6.3, obliging BI to reasonably approve such items, Complaint ¶ 85. Thus, the Complaint alleges, by breaching the License Agreement, BI in turn "breached its obligations under the ARA to use its best efforts to do all things necessary, proper or advisable to make the ARA effective." *Id.*

BOT was at liberty to bring a breach of contract claim against BI under the License Agreement. The Court is not privy to BOT's thinking in eschewing such a claim in favor of a claim under the ARA, but presumably the decision to sue under the ARA was for one or more tactical reasons.[10]

---

[10] One possibility is that, with the arbitral panel having found multiple material breaches by BOT of the License Agreement, BOT feared that, in a lawsuit under the License Agreement, it could not establish its own substantial compliance with that agreement, as New York law requires of a plaintiff claiming breach of contract. Another possibility relates to the two agreements' different remedial schemes. The License Agreement provides for arbitration at either party's election, *see* Licensing Agreement, Art. 13, but the ARA does not contain an arbitration provision. BOT may have wished to avoid arbitration. Another possibility is that BOT perceived that a suit under the License Agreement—or a petition to confirm or vacate an arbitral award resolving claims under that agreement—might be assigned to this Court and the Second Circuit, forums where BOT has met with limited success in the suits with BI arising under that agreement. Finally, BOT may have perceived that the principal remedy it seeks—termination of the License Agreement in its favor, and transfer of the rights to operate Benihana restaurants in Hawaii to BI, and associated intellectual property rights—does not naturally follow from the License Agreement's text. That agreement contemplates the termination of BOT's license in the event of material breaches by BOT, *see* License Agreement, Art. 12, but it does not provide for termination of BI's right to operate (or license to others the right to operate) Benihana restaurants in Hawaii in the event of breaches by BI. *See, e.g.*, License Agreement, Art. 12.4(a) ("Upon termination of this Agreement for any reason, [BOT]'s right to use in any manner the marks 'Benihana', 'Benihana of Tokyo', or the 'flower' symbol or any other mark registered by [BI] (or insignia or slogan used in connection therewith), or any confusingly similar trademark, service mark, trade names or insignia shall terminate forthwith.").

In light of BOT's decision to sue under the ARA, the issue then is whether breaches by BI of the License Agreement provisions requiring it to reasonably approve BOT's menus and advertisements—as BOT's Complaint alleges—breach the "best efforts" provision of ARA § 7.05.  The answer is no, because the text of § 7.05 does not permit such a conclusion.

BOT's Complaint focuses on the first sentence of § 7.05, which requires the parties each to use "best efforts to take, or cause to be done, all things necessary, proper or advisable."  But BOT's Complaint leaves out the all-important conclusion of that sentence, which qualifies the parties' obligation to use best efforts "to consummate and make effective the *transactions* contemplated by this agreement."  ARA § 7.05 (emphasis added).  And, as the ARA makes clear throughout, the "transactions" contemplated by the ARA were those necessary to bring about the one-time 1995 transfer of assets and rights among the Benihana entities.  To this end, the ARA describes in its recitals "the transactions contemplated hereby" as involving "*the business and assets of BOT*."  *Id.,* Recital B (emphasis added).  And the ARA's text and structure in every respect reveal that the transactions at issue were those necessary to effect and complete the business merger that is the ARA's subject.  The ARA's preface describes the ARA as an "Agreement and Plan of Reorganization." *id.* at 1.  Its recitals state that the boards of BOT and predecessor entity Benihana National Corp. had determined to effect an acquisition by forming BI, under which "the business and assets" of BOT would be transferred to BI, *id.,* Recital B. And the ARA's provisions address the transfer of assets, *id.*, Art. 1; the terms of the merger, *id.* Art. II; the conversion and exchange of shares, *id.*, Art. III; the parties' representations and warranties and covenants, *id.*, Arts. IV–VII; the conditions to consummation of the reorganization, *id.,* Art. VIII; and the ability of either party to terminate the Agreement and the reorganization under designated circumstances before it took effect, *id.*, Art. IX.

The ARA's text thus refutes the premise—on which BOT's breach of contract claim rests—that BI's commitment in the first sentence of § 7.05 of the ARA to use "best efforts" was a general commitment to use "best efforts" in all future business dealings with BI, in perpetuity. Section 7.05 instead is tightly focused on the transactions needed to effect the reorganization that was the subject of the ARA.  Confirmation is supplied by § 7.05's second sentence, which, unlike the first sentence, addresses post-closing events.  It reads:  "In case at any time after the Effective Time[11] any further action is necessary or desirable to carry out the purposes of this Agreement, the proper officers and directors of each party to this Agreement shall take all such necessary action."  *Id.* § 7.05.  BOT's Complaint, tellingly, does not claim a violation of that commitment.

BOT's notion that the ARA and the License Agreement are effectively interchangeable, such that a breach of the latter is necessarily a breach of the former, is, further, at odds with the case law addressing when multiple writings should be construed as a single agreement.  Like other issues of contract law, that question turns on the intent of the parties as expressed in their writings, and, except in cases of ambiguity, whether multiple writings constitute a single contract is a question of law for the court.  *TVT Records v. Island Def Jam Music Grp.*, 412 F.3d 82, 89 (2d Cir. 2005).  "Generally, separate writings are construed as one agreement if they relate to the same subject matter and are executed simultaneously."  *Commander Oil Corp. v. Advance Food Serv. Equipment*, 991 F.2d 49, 53 (2d Cir. 1993).  Agreements executed on different dates, and even between incongruent parties, can form a common agreement when they are designed to effect the same purpose and form part of the same transaction.  *TVT Records*, 412 F.3d at 89–90.

---

[11] The ARA defines the "Effective Time" as the closing date of the ARA, *id.* § 2.02, which in turn was to take place five days after shareholder approval, *id.* § 2.04.

A court examines whether the contracts are "inextricably intertwined" and whether the breach of either agreement would undo the obligations imposed by the other. *See Fundamental Long Term Care Holdings, LLC v. Cammeby's Funding LLC*, 985 N.E.2d 893, 897 (N.Y. 2013); *see also Commander Oil Corp.*, 991 F.2d at 53 (contracts should be interpreted together "if the parties assented to all the promises as a whole, so that there would have been no bargain whatever if any promise or set of promises had been stricken" (quoting 6 Williston, *Contracts*, § 863, at 275 (3rd ed. 1970)).

The ARA and the License Agreement are not of such a nature. There is, in fact, only one reference in the ARA to the License Agreement, in § 8.02. The ARA requires, among 10 conditions to making the ARA effective, that BI

> shall have entered into a license agreement (the "License Agreement") with BOT granting BOT rights to use the Trademarks in the Territory in connection with the "Benihana of Tokyo" Restaurant located in Honolulu, Hawaii and granting BOT perpetual, exclusive rights to own or operate "Benihana of Tokyo" restaurants in the State of Hawaii, subject only to the terms and conditions of the franchise agreement covering the Maui restaurant to which BNC is a party and having the terms and conditions set forth on Schedule 8.02(d).

ARA § 8.02(d). It is undisputed that BI complied with that provision. It did so by entering into the License Agreement. Notably, though, the ARA does not anywhere say, or even imply, that a subsequent failure to comply with the License Agreement would represent a breach of the ARA. And the one ARA provision which BOT claims was violated, § 7.05, is, as noted above, inapposite.

Significant, too, the agreements address substantially different topics: The ARA covers the terms of a worldwide corporate re-organization, whereas the License Agreement covers the terms under which a particular restaurant would be licensed. They also cover different periods: The ARA is addressed to a one-time corporate event, in 1995; the License Agreement, adopted

months later, sets the specifications governing BOT's license, anticipated to be perpetual, of the Honolulu restaurant. And the agreements are subject to different remedial mechanisms: The ARA is silent as to a forum for dispute resolution, whereas the License Agreement mandates arbitration in the event of a disputed termination by BI of BOT, and gives either party the option to elect arbitration for all other disputes. To permit BOT to sue under the ARA for a breach of the License Agreement in connection with BI's non-approval of menus and advertisements would subvert BI's right under the License Agreement to elect arbitration, much as permitting BOT to sue under the ARA for a breach of the License Agreement in connection with a decision by BI to terminate BOT's license would subvert the License Agreement's commitment of such disputes to mandatory arbitration.

Accordingly, there is no textual or doctrinal basis for treating the breaches that BOT alleges of the Licensing Agreement as breaches of the ARA. Given BOT's election to sue under the ARA alone, the Court is constrained to hold that BOT's breach of contract claim fails to state a claim, because BI's allegedly unreasonable refusals to approve ads and menus proposed by BOT is not a breach of the ARA. In dismissing BOT's contract claim based on failure to allege breach, the Court has no occasion to reach BI's other challenges to that claim.

This ruling, however, is without prejudice to BOT's right to pursue, whether in court or in an appropriate arbitral forum consistent with the License Agreement, a claim of breach of contract based on an alleged breach of the License Agreement. The Court here expresses no opinion as whether the factual allegations in BOT's present Complaint would state a claim for breach of that agreement.

    **3.**  **Breach of the Implied Covenant of Good Faith and Fair Dealing**

The Court must also dismiss BOT's claim against BI for breach of the covenant of good faith and fair dealing implied in the ARA.

Under New York law, a duty of good faith and fair dealing is implied in every contract, in which in every contract "there is an implied undertaking on the party of each party that he will not intentionally and purposely do anything to prevent the other party from carrying out the agreement on his part." *Chemical Bank v. Stahl*, 272 A.D.2d 1, 14 (N.Y. App. Div. 1st Dept. 2000) (quoting *Patterson v. Meyerhofer*, 97 N.E. 472, 473 (N.Y. 1912)).  Although the covenant does not include any obligation inconsistent with the terms of the contractual relationship, it includes promises that a "reasonable person in the position of the promisee would be justified in understanding were included" in the contract, that "neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract," and, when the contract involves the exercise of discretion, that the party promises "not to act arbitrarily or irrationally in exercising that discretion." *Dalton v. Educational Testing Serv.*, 663 N.E.2d 289, 291–92 (N.Y. 1995) (citations omitted).  The elements of such a claim are similar to causes of action for breaches of duties of care, in that the tort requires the existence of a duty, breach of that duty, causation, and damages.  *See Pastor v. Woodmere Fire Dist.*, No. 16 Civ. 892 (ADS), 2016 WL 6603189, at *7 (E.D.N.Y. Nov. 7, 2016) (citation omitted).

Critical here, when a plaintiff claims a breach of the implied covenant of good faith and fair dealing based on the same facts as a breach of contract claim and seeking identical damages for the breach, the claim for the breach of the covenant of good faith and fair dealing must be dismissed as duplicative of the breach of contract claim.  *Amcan Holdings, Inc. v. Canadian Imperial Bank of Commerce*, 70 A.D.3d 423, 426 (N.Y. App. Div. 1st Dept. 2010) (citations omitted).  Such is the case here.  BOT's claim for breach of the implied covenant of fair dealing

duplicates its breach of contract claim.  BOT's contract claim alleges that BI "unreasonably and repeatedly withheld its approval for BOT's menus and ads" and thereby breached its "best efforts" obligation under ARA § 7.05.  *Id.* ¶ 85.  BOT's covenant of good faith and fair dealing claim incorporates that allegation by reference, *id.* ¶ 87, and, like the contract claim, faults BI for failing to carry out its duty to abide by the parties' Licensing Agreement.  *Id.* ¶ 90.  These claims are duplicative.  And with each, BOT seeks identical damages.  *Id.* ¶¶ 86, 91.

As such, BOT's claim for breach of the implied covenant of good faith and fair dealing impermissibly duplicates its breach of contract claim under the ARA.  The Court therefore dismisses BOT's claim for breach of the implied covenant of good faith and fair dealing.

## CONCLUSION

For the foregoing reasons, the Court denies BOT's motion to remand this case to state court and grants BI's motion to dismiss the Complaint.

This dismissal is without prejudice to BOT's right to pursue, based on the same factual allegations, a claim of breach of contract based on the License Agreement, as opposed to the ARA.  Consistent with the License Agreement, BOT is at liberty to pursue such a claim either in court or in arbitration.

The Clerk of Court is respectfully directed to terminate the motions pending at Dkts. 8 and 27, and to close this case.

SO ORDERED.

Paul A. Engelmayer

Paul A. Engelmayer
United States District Judge

Dated: March 8, 2017
      New York, New York